MONTANA DEMOCRATIC PARTY, as
an organization and representative of
its members, Joseph Breitenbach and
Cynthia Anne Green, Plaintiffs,

v.

Jacob EATON, Max Hunsaker, Montana
Republican Party, and Brad Johnson
in his official capacity as Montana
Secretary of State, Defendant.

No. CV 08–141–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Oct. 8, 2008.

As Amended Oct. 10, 2008.

John J. Mudd, Peter M. Meloy, Mudd
Nelson, Missoula, MT, for Plaintiffs.

## ORDER NUNC PRO TUNC

**DONALD W. MOLLOY**, District Judge.

If liberty and equality, as is thought by some, are chiefly to be found in democracy, they will be best attained when all persons alike share in the government to the utmost.

— Aristotle

If we do not provide time for the consideration of people and events in depth, we may end up training another generation of television adults who know what kind of toilet paper to buy, who know how to argue and humiliate others, but who are thoroughly incapable of discussing, much less dealing with, the major social and economic problems that are tearing America apart.

— Herbert Kohl, Educator [1]

In this case, the Montana Democratic Party and two named electors seek a temporary restraining order, a preliminary injunction, and a declaratory judgment that recent actions by operatives of the Montana Republican Party violate state and federal law. The problem here is whether the actions of Defendants—the Executive Director and Legislative Director of the Montana Republican Party—in filing *en masse* challenges to the right to vote of 6,000 Montana citizens who are registered voters, and Secretary of State Brad Johnson's response to these challenges, are violations of federal law to which this Court is empowered to provide a remedy. The relief sought is pursuant to the National Voter Registration Act, the Fourteenth Amendment's Equal Protection Clause, and 42 U.S.C. §§ 1983, 1985, and 1971. The National Voter Registration Act, enacted by a Congress composed of Republicans and Democrats, is intended to "in-crease the number of eligible citizens who register to vote in elections for federal office" and to ensure that states may "enhance[ ] the participation of eligible citizens as voters." 42 U.S.C. § 1973gg(b)(1)-(2). Ostensibly justified by their concern for the integrity of the electoral system, the individual defendants [2] have apparently filed false affidavits with the express intent to disenfranchise voters in counties that have historically tipped toward the Democratic party.

**I**

Montana law, Mont.Code Ann. § 13–13–301(1), allows any registered elector to challenge any other "elector's right to vote" by "filling out and signing an affidavit stating the grounds of the challenge and providing any evidence supporting the challenge to the election administrator[.]" The Executive Director of the Montana Republican Party, Jacob Eaton, filed over 6,000 challenges to fellow citizens' voting rights. Some of the challenged voters have provided sworn testimony demonstrating that Eaton's concern for integrity is of a limited scope, and does not extend to the affidavits he filed requesting the cancellation of their voter registration. According to the record, Eaton plans to file more challenges across the state of Montana before election day. *See* Pl. Ex. A to Mot. His public expressions of concern for the integrity of the democratic process and for the rights of his fellow Montanans notwithstanding, these challenges do not appear directed at the state-wide voting population, but rather at select counties that likely contain concentrations of Democratic voters.

---

1. *Moyers on Democracy*, Bill Moyers, p. 85.

2. Secretary of State Brad Johnson is not included in this reference. Review of the plead-ings and attachments show an effort on his part to avoid partisan decision-making and a good faith attempt at complying with state law.

The Montana Legislature has established a process for evaluating voter challenges. Part of that process is set forth in Mont.Code Ann. § 13–1–111, which provides that "a person may not vote at elections unless the person is . . . a resident of the state of Montana and of the county in which the person offers to vote for at least 30 days . . . ." Determined to prevent the Hobbesian nightmare sure to ensue if voters' mailing addresses do not match their residential addresses, Eaton employed an auditor to pore over the United States Postal Service's change of address registry, and to compare the names in it to the names on voter rolls in some Montana counties. A self-described guardian of the integrity of a political system designed to guarantee the right of the people to govern themselves, Eaton targeted counties with young and likely Democratic voters, who might have changed their mailing addresses without changing their voter registration information. The challenge theory must be that such voters might compromise the democratic process by going off to college or serving in the military overseas, and forwarding their mail to their new location or to a family member—both examples of voters Eaton challenged. Pl. Ex. B–2 to Mot.; Pl. Ex. C to Mot.

In his zeal to protect what he sees as Montana's fragile democracy from these transient hordes, Eaton ignored the very law that answers his challenges. How can one so concerned with the integrity of the State's democratic process be adept at invoking the law to keep people from voting, without realizing that the same law renders his claim meritless if not frivolous? Montana Code Annotated § 13–2–512 states:

An elector who has changed residence to a different precinct within the same county and has failed to notify the election administrator of the change by a transfer or new registration form may vote in the precinct where the elector is registered at the first election at which the elector offers to vote after the change[.]

In other words, even if a registered voter moves and overlooks the requirement of notifying the election administrator of the change, the voter still gets to vote.

The *procedural effect* of Eaton's challenges to his fellow citizens' voting rights is not addressed by the statute. Importantly, it is the procedural effect of Eaton's challenges that raises the issues here. Montana law provides that when a citizen challenges another citizen's right to vote prior to the close of registration, "the election administrator shall question the challenger and the challenged elector and may question other persons to determine whether the challenge is sufficient or insufficient to cancel the elector's registration." Mont.Code Ann. § 13–13–301(3). When a challenge is made after the close of registration or on election day, "the election administrator or, on election day, the election judge[,] shall allow the challenged elector to cast a provisional paper ballot." *Id.* One can imagine the mischief an immature political operative could inject into an election cycle were he to use the statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy. Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people— has been challenged. The mess created for those volunteers and elected officials dedicated to preserving the integrity of the system is nearly unimaginable in terms of the time and expense necessary to deal with such blanket challenges.

In light of the statute cited above, it appears that some of the sworn affidavits Eaton filed (the exemplars Plaintiffs sub-

mitted as exhibits) falsely assert that electors are not qualified to vote under state law. *See* Pl. Ex. B, B–2 to Mot. Nonetheless, for those voters Eaton has challenged, regardless of the truthfulness of his claims, the law requires the counties in which the challenges are filed to respond. *See* Mont.Code Ann. § 13–13–301. Based on the filings before the Court, it appears that the county clerk and recorder sends a letter to a challenged voter, notifying the voter of the challenge and instructing the voter how to respond. Eaton has thus positioned thousands of Montana voters, who have only changed their mailing addresses, to receive notice from county officials that their right to vote has been challenged and that they need to take some action in response to the challenge, even though the challenge may be meritless. Plaintiffs contend this violates federal law.

As explained below, at this early stage of these proceedings the Court cannot agree with this contention. But, this does not end the inquiry. Also explained below, the Secretary of State's "Challenge Resolution," a review of statutes and administrative rules designed to help counties evaluate challenges like those at issue here, appears to create the potential for serious violations of state and federal law when a challenged elector offers to vote. *See* Pl. Ex. J. While, at this time, I find Plaintiffs' arguments unpersuasive that the actions of the Montana Republican Party officials and the Secretary of State violate federal law and warrant immediate injunctive relief, the mischief Eaton has injected into Montana's electoral process may have brought to light significant violations of state and federal law, and the consequences of these violations should not rest on the shoulders of citizens seeking to vote.

## II

Issuance of a temporary restraining order is governed by Fed.R.Civ.P. 65(b):

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

 Plaintiffs' counsel has certified in writing that they attempted to contact Defendants prior to filing their Motion for Temporary Restraining Order. *See* dkt # 1 at 2–3. As has been made public at this point, nearly 6,000 letters to challenged voters were scheduled to go out the day the request was filed, thus prompting Plaintiffs to invoke Rule 65(b). Apparently in response to the filing of Plaintiffs' complaint, the Secretary of State has astutely directed the involved counties to refrain from sending the letters of challenge. Consequently, the allegedly immediate and irreparable injury Plaintiffs' motion addresses is not as immediate as it first appeared.

Nevertheless, it is still necessary to address the substance of Plaintiff's motion and complaint. There seems to be meat on the bones of Plaintiffs' argument, so, pursuant to Fed.R.Civ.P. 65(a)(2), Defendants will be required to respond. There will be a hearing on the Motion for Preliminary Injunction on October 14, 2008 at 9:00 a.m. The parties shall be prepared to 1) argue the merits of their respective positions in light of the reasoning set forth in this Order, and 2) present evidence in support of their respective positions.

## III

### A.

The National Voter Registration Act, 42 U.S.C. § 1973gg *et seq.,* recognizes that states implement programs to periodically clear their voter rolls of stale information to ensure current and accurate voter registration information. The Act requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters ...". 42 U.S.C. § 1973gg–6(a)(4). The Act recognizes as well that if such programs are not tailored to protect the right of citizens to vote, eligible voters might be improperly removed from official voter lists. So, the Act establishes limits on the processes states may use to purge their voter rolls of ineligible voters. Under Federal law, while subsection (c)(1)(A) of § 1973gg–6 expressly allows a state to consider "change-of-address information supplied by the U.S. Postal Service to identify registrants whose addresses may have changed," subsection (c)(2)(A) expressly prohibits a state from conducting any program to identify ineligible voters any less than 90 days before an election for federal office. Moreover, the Federal Act provides,

> A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or has failed to respond to a notice described in paragraph (2) [of the same subsection]; and has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

Simply put, a state cannot prevent a citizen from voting on the ground that the citizen has changed his or her address. This rule is subject to exceptions but it is designed to protect the citizen's right to vote for at least two federal election cycles while the citizen updates his or her registration information. The idea is to promote voting while allowing states, in limited circumstances and after the passage of time, to purge voter lists of lazy, incompetent or deceased voters.

If the State of Montana, instead of the Montana Republican Party, engaged in the conduct that has created this controversy, its actions would violate the Federal Voter Registration Act. Consider this: Eaton's challenges were filed well inside the 90–day moratorium on clearing voter rolls, and they are predicated on bases the Act declares illegal. *See, e.g.,* Pl. Ex. B to Mot. The timing of the challenges is so transparent it defies common sense to believe the purpose is anything but political chicanery. If Eaton was truly concerned about systemic integrity, and not electioneering, his issues could have been raised much earlier. Eaton is, according to his own statements, attempting to accomplish what the Act prohibits the State of Montana from doing—ensuring the accuracy of voter rolls less than 90 days before an election on the sole basis of change-of-address information. The Act places these restrictions on states for the very reason this case is now before the Court: using change-of-address information to purge voter rolls less than 90 days before an election creates an unacceptable risk that eligible voters will be denied the right to vote.

Plaintiffs argue that Montana law allows the State, in response to challenges like those Eaton has filed, to remove regis-

trants from voter rolls, and therefore Montana law runs afoul of the limits the Voter Registration Act establishes. Where state and federal law conflict, the Supremacy Clause of the Constitution mandates that federal law trumps state law. Plaintiffs thus ask for a declaratory judgment that the Montana laws enabling the challenges Eaton has filed are void under federal law. In my view, it is not clear from the filings before me that the argument is sound. While it is clear that if Eaton were the State, or acting as an agent of the State of Montana, his actions would be illegal, it is not clear whether Secretary of State Johnson's response to the voter challenges at issue here is illegal. In other words, while Eaton and the Montana Republican Party are abusing the process the State of Montana has provided to ensure the accuracy of voter rolls (indeed, they are using the process designed to protect the integrity of the political process to undermine it), this partisan ploy is not necessarily a violation of federal law by the State of Montana.[3]

On the question of the State's involvement, the pertinent document before the Court is the Secretary of State's "Challenge Resolution." Pl. Ex. J. to Mot. The Secretary's Resolution is a review of statutes and administrative rules. Its stated purpose is "to review the statutes and rules that may help [county election officials] to resolve any challenge to a voter's registration." The document cites a state administrative regulation expressing the general principle against which challenges are evaluated: "Any challenge made under this rule shall be decided in favor of the challenged elector, unless it is demonstrated by a preponderance of the evidence that the challenged elector should not be permitted to vote." ARM 44.3.2109(6).

The Resolution also addresses the specific type of challenge at issue here. It cites Mont.Code Ann. § 13–1–112(8), which states that "[a] change of residence may be made only by the act of removal joined with intent to remain in another place." The guide also addresses the effect of a change of address on an elector's registration status:

A change of post office address is not conclusive proof of a change of residence and can be rebutted by an elector's proof of intent to remain at the registration residence in the voting process, as described below. Therefore, while additional evidence should be weighed by the preponderance of evidence standard, a postal change of address form by itself is insufficient to cancel the registration, especially of an elector who confirms his residence in the voting process.

■ These last two sentences of the guide present a critical problem. While Mont.Code Ann. § 13–1–112(8) states that a change of residence "may be made only by the act of removal joined with intent to remain in another place," the Secretary of State's instructions to county officials could be construed to require a voter challenged on the basis of change-of-address information to rebut a presumption of changed residence with "proof of intent to remain at the registration residence[.]" Because the federal National Voter Registration Act makes it illegal to deny an elector his or her vote based on a change of address, subject to limited exceptions not implicated here, if Montana county election officials are required, or even allowed, to compel an elector challenged on the basis of change-of-address information to prove anything, there is a violation of federal law.

---

**3.** The fact that the Secretary of State has directed counties not to send challenge letters at this time perhaps indicates his awareness of the problems for the State of Montana, as they relate to violations of federal law, that Eaton's abuse of the political process may have exposed.

■ By virtue of Montana law, when a citizen challenges another citizen's right to vote prior to the close of registration, "the election administrator shall question the challenger and the challenged elector and may question other persons to determine whether the challenge is sufficient or insufficient to cancel the elector's registration." Mont.Code Ann. § 13–13–301(3). Under the Federal National Voter Registration Act, the challenges Eaton has filed are *per se*, that is, on their face, insufficient to cancel an elector's registration. While the Secretary's Resolution seems to echo this conclusion when it says that "a postal change of address form by itself is insufficient to cancel the registration," the apparent certainty of this instruction is undermined by the next phrase, "especially of an elector who confirms his residence in the voting process." A voter cannot be required to confirm his or her address under these circumstances. The elector must be allowed to vote by regular ballot, or there is a violation of the National Voter Registration Act.

■ The process the Secretary's Resolution prescribes for evaluating the three "Categories of Challenged Electors" further confuses the State's response to challenges like those Eaton filed against the 6,000 Montana voters. It is not clear, from the plain language of the Secretary of State's instructions, whether an election administrator has discretion to deny an elector the opportunity to vote because of a challenge based on change-of-address information, or whether an election adminis-

trator must allow the challenged elector to vote. For example, for the "first category" of challenged electors—i.e., electors a challenger claims filled out change-of-address forms for an in-county address change, but whose postal addresses allegedly do not match the residence addresses on file with the county—the Resolution states a county official reviewing the challenge "may ... determine ... that the challenge should be resolved in the elector's favor." The use of the word "may" indicates that the county official has discretion to accept or reject the challenge. Such an interpretation of the law is wrong. Anything other than an unqualified rejection of the challenge would violate federal law.[4]

Eaton's challenges are meritless under federal law. It is not within the power of this Court, however, to compel Eaton or anyone else to demonstrate a healthy respect for the rule of law and its role in a democratic political community. The responsibility for preventing such a cynical use of state law by a private citizen or political party lies with the voters themselves. But, if the State's procedure for evaluating voter challenges allows a county election official to conclude that any voter Eaton has targeted on the basis of change-of-address information cannot vote, or that the elector has to prove anything before he or she is allowed to vote, the State would then be in clear violation of federal law. It is possible, of course, that my interpretation of the Secretary of State's instructions are incorrect. There is enough of a question to warrant a hearing at which the

---

4. It would appear to violate state law as well, due to the Montana Code Annotated's explanation of what qualifies as a change of residence. *See* Mont.Code Ann. §§ 13–1–112(8). Section 13–2–512 of the Code, discussed *supra*, seems to conclusively establish that anything other than a rejection of a challenge based on change-of-address information would violate state law:

An elector who has changed residence to a different precinct within the same county and has failed to notify the election administrator of the change by a transfer or new registration form may vote in the precinct where the elector is registered at the first election at which the elector offers to vote after the change or at a central location designated by the election administrator[.]

parties may present evidence and argue the issue.

### B.

Plaintiffs argue that challenged voters are subject to processes peculiar to the county in which they are challenged, and that disparate treatment across counties violates the Equal Protection Clause of the Fourteenth Amendment. They claim that Mont.Code Ann. § 13–13–301 is ambiguous and "opens the door to voters being treated differently...." Plaintiffs' argument might be better presented in state court as a challenge under Mont.Code Ann. § 13–1–201, through which the people of Montana have imposed on the Secretary of State the duty, as chief election officer, to "obtain and maintain uniformity in the application, operation, and interpretation of the election laws[.]"

Reading §§ 13–1–201 and 13–13–301 together, Plaintiff's argument, to the extent it appears to be a facial challenge to Mont. Code Ann. § 13–13–301, is not well taken. As discussed *supra* at **III A.**, the question here is whether the voters against whom Eaton has filed his meritless challenges are subjected to illegal procedures by county election officials at the direction of the Secretary of State. Plaintiffs will have an opportunity to show they are at the hearing.

### C.

■ Plaintiffs argue that the Montana Republican Party's *en masse* challenges to the right of Montanans to vote violates 42 U.S.C. § 1983. Nothing in the pleadings indicates that Eaton, when he filed his challenges, was acting under color of state law. Plaintiffs argue that because of Eaton's actions, "thousands of voters from across Montana may soon receive notification *from the state* that their voter registration is in doubt," and therefore his actions are "fairly attributable to the state." As noted *supra* at **II,** however, apparently the Secretary of State has directed counties not to send the challenge letters. As already discussed *supra* at **III A.,** the question of state action is pertinent here because the counties' procedures for dealing with Eaton's challenges, at the direction of the Secretary of State, may violate federal law.

### D.

■ Plaintiffs claim that Defendants have violated 42 U.S.C. § 1985(3). This claim is foreclosed by the settled rule in the Ninth Circuit that "section 1985(3) is extended beyond race only when the class in question can show that there has been a governmental determination that its members require and warrant special federal assistance in protecting their civil rights." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir.1992). Under Ninth Circuit law, to state a claim under section 1985(3), Plaintiffs must show that "the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has indicated through legislation that the class required special protection." *Id.* The National Voter Registration Act protects voters generally. Plaintiffs claim that Defendants' actions here interfere with likely Democratic voters, without providing any authority for the proposition that likely Democratic voters are a suspect class section 1985(3) contemplates. It is not likely that Plaintiffs could succeed on this legal theory.

### E.

Likewise, it is unlikely that the facts Plaintiffs allege give rise to a colorable claim under 42 U.S.C. § 1971.

### IV

In accordance with the foregoing,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Temporary Restraining Order (dkt # 1) is DENIED.

IT IS FURTHER ORDERED that pursuant to Fed.R.Civ.P. 65(a)(2), a hearing is set for Tuesday, October 14, 2008, at 9:00 a.m., at the Russell Smith Courthouse in Missoula, Montana. The parties shall be prepared to argue the merits of their respective positions regarding Plaintiffs' request for declaratory judgment and injunctive relief in light of the reasoning set forth in this Order, and to present evidence in support of their positions.[5]

IT IS FURTHER ORDERED that each party shall, on or before Friday, October 10, 2008, at 12:00 noon, file with the Court a brief consisting of no more than five (5) pages, exclusive of documentary exhibits, concisely setting forth their positions and notifying the Court of any witnesses they intend to call at the hearing.

---

**5.** After the initial filing of this Order on October 8, 2008, a party inquired of the Court as to which parties the Court was ordering to attend the hearing. The Court has made no determination as to how the parties should proceed to address the merits of Plaintiff's motion and complaint, or to address the questions the Court identifies in this Order. The purpose of the hearing is to proceed to the merits of the factual and legal issues Plaintiff's motion and complaint have raised, pursuant to Fed. R. Civ. P. 65(a)(2).